### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAHD UMAR ABDULMAJID AL-SHAREEF, *et al.*, | |
| Petitioners/Plaintiffs, | **Case No. 05-520 (RWR)** |
| v. | |
| GEORGE W. BUSH, *et al.*, | |
| Respondents/Defendants. | |

## DECLARATION BY JENNIFER CHING, ESQ.

I, Jennifer Ching, declare that the following statements are true to the best of my knowledge, information, and belief:

1.      I am a member of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for Petitioners in the above-captioned action.  I offer this Declaration in support of the Petitioners' Motion for a Preliminary Injunction Requiring Respondents to Provide Counsel for Petitioners and the Court With 30-Days' Advance Notice of any Intended Removal From Guantánamo.

2.      On December 23, 2005, Petitioners commenced this action by filing a Petition for Writ for Habeas Corpus and Complaint For Declaratory and Injunctive Relief.

3.      On June 28, 2006, Petitioners' counsel notified counsel for the Respondents of Petitioners' intent to make the present application.  Respondents indicated that they would oppose such application.

4.    Counsel for Petitioners believe that the permanent deprivation of due process and the serious risk of torture or cruel, inhuman or degrading treatment warrants an immediate Order to preserve the *status quo* while the Court considers Petitioners' Motion for a Preliminary Injunction.

5.    Attached hereto as Exhibit A is what I believe to be a true and correct copy of a press release issued by the United States Department of Defense on June 24, 2006, entitled "Detainee Transfer Announced."

6.    Attached hereto as Exhibit B is what I believe to be a true and correct copy of a transcript of a U.S. State Department press briefing held on June 29, 2006.

7.    Attached hereto as Exhibit C is what I believe to be true and correct copies of an electronic mail communication between Jennifer Ching, counsel for Petitioners, and Andrew Warden, counsel for Respondents, dated June 28, 2006, and electronic mail communications between Julia Mason, counsel for Petitioners, and Terry Henry, counsel for Respondents, dated March 13, 2005 and March 14, 2005.

8.    Attached hereto as Exhibit D is what I believe to be a true and correct copy of a press release issued by the United States Department of Defense on August 26, 2006, entitled "Detainee Transfer Announced."

9.    Attached hereto as Exhibit E is what I believe to be a true and correct copy of the Affidavit of Brian Evans, submitted Sept. 17, 2004 in *Ali* v. *Ashcroft*, No. 04-1258 (JDB).


_____/s/_____

Jennifer Ching, Esq.


Dated: August 28, 2006

# EXHIBIT A



**U.S. Department of Defense**
Office of the Assistant Secretary of Defense (Public Affairs)

# News Release

On the Web:
http://www.defenselink.mil/Utility/PrintItem.aspx?
print=http://www.defenselink.mil/releases/2006/nr20060624-
13329.html
Media contact: +1 (703) 697-5131

Public contact:
http://www.dod.mil/faq/comment.html
or +1 (703) 428-0711

**IMMEDIATE RELEASE**

No. 594-06
June 24, 2006

### Detainee Transfer Announced

The Department of Defense announced today that it transferred 14 Saudi detainees from Guantanamo Bay, Cuba, to Saudi Arabia.

This movement included one detainee found to no longer be an enemy combatant by the Combatant Status Review Tribunals. The other thirteen detainees were approved for transfer by an Administrative Review Board (ARB) decision at Guantanamo.

With today's transfer, approximately 120 detainees remain at Guantanamo who the U.S. government has determined eligible for transfer or release through a comprehensive series of review processes. Departure of these remaining detainees approved for transfer or release is subject to ongoing discussions between the United States and other nations. The United States does not desire to hold detainees for any longer than necessary. The department expects that there will continue to be other transfers or releases of detainees.

There are ongoing processes to review the status of detainees held at Guantanamo. A determination about the continued detention or transfer of a detainee is based on the best information and evidence available at the time, both classified and unclassified.

With this transfer, approximately 310 detainees have departed Guantanamo to other governments, including Albania, Afghanistan, Australia, Bahrain, Belgium, Denmark, France, Great Britain, Kuwait, Morocco, Pakistan, Russia, Saudi Arabia, Spain, Sweden and Uganda.

Approximately 450 detainees remain at Guantanamo.

# EXHIBIT B

Westlaw.                                                        **News**Room

6/29/06 STATEPRELES (No Page)                                      Page 1


6/29/06 St. Dep't Press Releases & Documents (Pg. Unavail. Online)
2006 WLNR 11286941

STATE DEPARTMENT DOCUMENTS
Copyright 2006 Federal Information & News Dispatch, Inc.

June 29, 2006

Section: STATE DEPARTMENT BRIEFINGS

STATE DEPARTMENT BRIEFINGS
Daily Press Briefing -- June 29


Daily Press Briefing

Adam Ereli, Deputy Spokesman

Washington, DC

June 29, 2006

INDEX:

GUANTANAMO BAY

  President Bush's Statement / U.S. Policy on Detainee Transfers

  Respect Humanitarian Rights of Detainees

  Numbers of Transfers to Jordan / Reports of Torture in Jordan

  Transfer Agreements Safeguard Humanitarian Rights of Detainees

IRAN

  G8 disappointed by Lack of Iranian Response

  G8 Foreign Ministers Discuss Issue in Moscow Press Conference / Next Steps

ISRAEL / PALESTINIANS

  G8 Ministers' Statement on Recent Events in Gaza

  All Parties Seeking Release of Israeli Soldier / Role of Egypt / Role of Syria

  U.S. Aid to Palestinians

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/29/06 STATEPRELES (No Page)                                    Page 2

SYRIA

  Khaled Mashaal Faction of Hamas / Hamas Responsible for Actions of Members

ROMANIA

  Announcement of Romanian Troop Withdrawal from Iraq / U.S. Seeks Clarification

TURKEY

  Agenda for Visit of Foreign Minister Gul to Washington

KOSOVO

  Future Status of Refugees

TRANSCRIPT: 12:40 p.m. EDT

MR. ERELI: No words of introduction, so let's go over to Mr. Schweid.

QUESTION: The Supreme Court decision on Guantanamo, can you at this early point
say what impact it might have on the Administration handling of suspects? And what
is the government going to do? I guess you could always wait for another opening
on the Supreme Court, but it's still a close court. Any reflections on what the
court did and said?

MR. ERELI: I think obviously the President has spoken to this. I don't want to go
beyond what he said, which is that we're looking at it and we'll work to find a
way forward.

QUESTION: Do you remember the notion of -- you guys put down the idea of
transferring these people elsewhere, where for one thing, you thought they might
not be any better off or rights might not be protected.

MR. ERELI: I'm not -- frankly, I don't want to speak to the decision. It is a
ruling that the competent authorities are examining. I'll let them complete that
examination and speak to it when they're prepared to, so I don't want to do that.
I can repeat what's already been said about the general policy with regard to
detainees. The transfer arrangements I think we all know -- you all know very well
that there are provisions to transfer detainees to the country of -- to their
countries of origin when we can arrive at arrangements that provide for the both
the respect for the humanitarian rights of the prisoners as well as ensure that
they do not pose a security risk. There have been, I think, several hundred
prisoners transferred on this basis already and we are working to continue those
transfers. And I'm not aware that the ruling today affects that in any way.

QUESTION: In fact, even so far as accelerating transfers?

MR. ERELI: I wouldn't -- that -- I wouldn't go that far. I think we are -- we want
to transfer as many as we can as quickly as we can, but the constraint really is
negotiating effective agreements with countries that receive them.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/29/06 STATEPRELES (No Page)

Page 3

Yes.

QUESTION: Apparently we're demanding, meaning the West, a definitive answer by Iran by --

QUESTION: Can we stay on this, Joel? Are you changing the subject?

MR. ERELI: Yeah, let's stay on Hamdan if there continues to be interest in Hamdan.

QUESTION: Yeah. With reports that -- referring to what Barry said, that transfers would be sped up, you said you wouldn't put it that way, right? So there's not going to be any acceleration?

MR. ERELI: Well, I don't want to make -- I don't want to draw -- it sounded to me like in the question there was a link being drawn between this decision and speeding up transfers. I don't want to make that link. I don't want -- as I said, I'm not going to speak to this decision because I don't consider either myself or at this point the State Department the competent authority to speak to it because it has to be reviewed by those who are involved. That's not directly us.

On the subject of transfers, I was just trying to restate what our existing practice and policy is, which is to work to effect transfers as expeditiously as possible while respecting the requirements of effective transfers; i.e., ensuring that their humanitarian rights are respected and that there are effective security measures in place to ensure that these -- that these individuals do not pose a threat to the welfare of innocent citizens.

QUESTION: But unrelated to this case then, has there been an acceleration simply because the problem is --

MR. ERELI: This has and continues to be an issue or a process that we want to keep moving forward quickly, expeditiously. I wouldn't say acceleration or slowing up or speeding up. It's something that we have been working for a long time, that we continue to devote a lot of resources to, a lot of effort to, in order to reduce as soon as we can the population of Guantanamo in ways that both, again, are responsible and that respect the concerns of the countries involved and take full account of the threat that the people in Guantanamo present.

QUESTION: I'm sorry I don't have this memorized, but have some of the returned inmates gone back to Jordan, do you know off the top of your head?

MR. ERELI: I would have to check with regard to specific -- transfers specific to Jordan. There have been, obviously, hundreds of transfers effected to date, I think in the area of about 300. Actually, I'll need to check on that number, make sure it's accurate. 310? I'm not sure if that's releases and transfers or just transfers. So anyway, those are released who don't need to be held anymore. Those who are transferred are transferred from the custody of Guantanamo to the custody of the other country. So I think 310 is both releases and transfers. I'm not sure exactly how many of those are transfers.

Whether Jordan -- how many of them went back to Jordan, I'll check and see.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/29/06 STATEPRELES (No Page)

QUESTION: Are you aware of a report that, at least I'm just seeing it in the press today, from the UN investigator on torture that Jordan does systematically torture in its prisons there?

MR. ERELI: I have not seen that report. I will tell you that in order for a transfer to be effected as part of the transfer agreement there has to be reliable assurances and provisions in place to protect the humanitarian rights of the transferees. So in any transfer, whether it be to Jordan or Saudi Arabia or to Yemen or other places, that is part of the agreement and that is a necessary part of the agreement.

QUESTION: But if there's a record from the country -- of the country torturing in prisons, would you consider it reliable and satisfactory if they said but we won't torture this guy because you said we can't?

MR. ERELI: I think the transfer agreements are negotiated to provide every assurance that the humanitarian rights of the prisoners will be respected.

QUESTION: Well, what do you say then about countries that do have a standing record of torture?

MR. ERELI: I say that the transfer agreements are negotiated so that there's every assurance that the humanitarian rights of the transferees will be respected.

Yeah.

QUESTION: Adam, with respect to Iran, the U.S. as well as Russia and EU are demanding a total explicit statement by them by July 5th to renounce any further enrichment. And also that would include even though it's not on the present agenda their -- perhaps their sponsor of terrorism as it affects Iraq and perhaps Afghanistan as well?

MR. ERELI: I'm looking at the chairman's statement from the G-8 foreign ministers meeting which was issued a short while ago and I'd refer you to that statement for the position of the G-8 on the issue you just asked about. They said that they are disappointed in the absence of an official Iranian response to the positive proposal that's presented -- that's been presented. They said that we expect to hear a clear and substantive Iranian response to these proposals at the planned meeting between the High Representative of the European Union Javier Solana and Ali Larijani on the 5th of July and to bring these discussions to a rapid conclusion. So that's, I think, as full and complete an accurate a statement of where we are as you can possibly get.

QUESTION: I didn't see the State Department, but with the actions of the response, has a plan begun there on a UN -- turning to the UN? This was supposed to be a meeting that if you had no response or an inadequate response everybody happily was assembled to consider a tactic strategy for moving ahead against Iran in the United Nations. Has -- I'm not there. Maybe it's answered there. But I wondered if anything is going on in that area.

MR. ERELI: I would refer you to the statement. I'd also refer you to the press conference held by the G-8 foreign ministers following the conclusion of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/29/06 STATEPRELES (No Page)

ministerial. And they made it clear that the time has come for an Iranian response, they're looking forward to that response when they -- when Mr. Solana meets with Mr. Larijani, and that they will get together later, I think July 12th, to confer based on what Mr. Larijani hears when he meets with Mr. -- I'm sorry, what Mr. Solana hears when he meets with Mr. Larijani.

QUESTION: But that's virtually indistinguishable from what you said before this G-8 meeting.

MR. ERELI: What I said before is that they will get together, they will discuss where things are and assess next steps. They've done that and these are the next steps that they've decided on.

QUESTION: So you're willing to wait more than just weeks?

MR. ERELI: Well, I think we --

QUESTION: I mean --

MR. ERELI: And we've said weeks not months.

QUESTION: Well, that's months.

MR. ERELI: We're still in the weeks.

QUESTION: June 5 to July 12th?

QUESTION: May 15th to July 12th?

QUESTION: Oh, May 15th. That's months. That's not weeks. All right, light quibble.

MR. ERELI: Yes.

QUESTION: Could you bring us up to date on U.S. diplomacy vis-a-vis the Israel-Palestine issue? The Israelis seem to have paused their offensive in Gaza and I was wondering if this is something that the United States has either sought or approves of at the moment.

MR. ERELI: Again, I think the G-8 ministers were also pretty clear about this and we obviously subscribe to the statement there. The Secretary also spoke to it. We've made it clear that this -- the events of the past few days have been provoked by an act of terror. We condemn that act of terror. We are looking to the Palestinians to act effectively to prevent terror. There is, I think, concerted international diplomacy to effect the release of the captured soldier and it's important that Hamas do that immediately.

We have also collectively and for our part, the United States has urged all parties, including Israel, to exercise restraint, to prevent damage to -- harm to innocent civilians, because that remains a primary concern of ours, unlike, frankly, Hamas, which seems to be willing to put innocents in harm's way for their narrow political objectives.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/29/06 STATEPRELES (No Page)

And as we said yesterday, the diplomacy continues. The Secretary spoke to Foreign Minister Livni today, to Egyptian Director of Intelligence Omar Suleiman. I think all parties are continuing their contacts and their efforts to bring about the release of the soldier and bring this incident to an end.

QUESTION: It sounds like the U.S. approves of Israel holding its fire and with the aim of giving diplomacy more time, right?

MR. ERELI: The United States is -- again, I'd refer you back to the G-8 statement, where it says we --

QUESTION: But (inaudible) United States from the seven other countries whose views on Israel and the Middle East are not always coincident with the U.S. Government. They take a kind of a different view of Israel and its rights.

MR. ERELI: Well, the G-8 statement represents a consensus view. I think the Secretary -- we have expressed it clearly. This crisis was precipitated by an act of terror. It should be condemned. They should release the guy. Every effort should be made to protect innocents and to not take actions, which escalate the situation and we're all involved in trying to get the guy released so that we can pursue a reasonable path to peace which is negotiations, recognition, renunciation of terror, all with an aim to creating a two-state solution.

QUESTION: Are the arrests -- the kind of actions that the U.S. thinks are proper and restrained?

MR. ERELI: I think the arrests with regard to the arrests, again you'll see in the G-8 statement, that the detention of elected members of the Palestinian Government and legislature raise particular concerns.

Yes.

QUESTION: What is your understanding of the role that Egypt is playing now? We have some reports from the region that Egyptian talks with the Palestinians are intensifying.

MR. ERELI: Yeah. Egypt from the beginning, and this certainly remains the case, is playing a very important role in trying to affect the release of the soldier. They are using, I think, their contacts and expertise with all parties to see if they can't bring to this a peaceful resolution.

QUESTION: And did the Secretary ever put in another call to Prime Minister Abbas -- President Abbas?

MR. ERELI: No.

QUESTION: So only -- so three or four days ago, she's spoken to him. Is that -- when you say you're talking to all sides, you mean people below her (inaudible) contacts?

MR. ERELI: Yeah. Our contacts with Abbas are very -- are sustained and I think substantive.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/29/06 STATEPRELES (No Page)

Page 7

QUESTION: Why does she think it's helpful to call the Israeli Foreign Minister and not the Palestinians?

MR. ERELI: You know, this -- I wouldn't look at it as, you know, who's been called when. The fact is engagement is consistent and substantive. And when, you know, there needs to be a call, there's a call.

QUESTION: You wouldn't question the analysis that by beginning -- staying in constant touch with the Israelis that the Secretary of State tried very hard and apparently succeeded in inducing Israel to hold its fire and let diplomacy run its course. Why then would she be on their case so persistently?

MR. ERELI: Again, I think one -- there's a temptation to draw conclusions when those conclusions aren't necessarily warranted. The fact of the matter is: What's the objective of our diplomacy? The objective of our diplomacy is to resolve this peacefully and to prevent -- help prevent harm coming to innocents and to try to mount an effective response to parties that practice terror. That's the goal of American diplomacy. That's what the Secretary is trying to bring about. To the extent that we can do that, we're playing a positive and an important role. I think you see it in the G-8 statement. You see it in the fact that, to date, we, you know, the damage to innocents has been minimal. Obviously, we'd all like to see this crisis brought to an end in a peaceful way and that's what the Secretary's calls are designed to bring about. That's what, I think -- that's what everybody wants to see. So that's the best way I can explain the actions that we're undertaking and what we're trying to achieve.

Yeah.

QUESTION: Adam, with respect to this, are there any plans after the trip to Moscow to have the Russians intercede perhaps with the Syrians, because we don't have the best of relations with them?

MR. ERELI: Right.

QUESTION: And also would the Secretary go on to meet with both the Israelis and Palestinians?

MR. ERELI: I'm not going to predict diplomatic next steps. Obviously, you talk about the Syrians. The Syrians are definitely a party to this. Hamas has offices in Syria. Syria has relationships with elements of Hamas. They have a responsibility to act responsibly to bring this to a peaceful conclusion. The Secretary General, Mr. Annan, has spoken to that. He spoke to it yesterday and called on Syria to fulfill its responsibilities as a member of the UN and act to -- and use its influences, bring its influence to bear to obtain a release for the soldier. We certainly would encourage others with influence with Syria to do the same thing.

QUESTION: What do you think of the Israelis flying over the President's house?

MR. ERELI: I don't really have a comment on it.

QUESTION: You're not worried that that might escalate things even worse?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/29/06 STATEPRELES (No Page)                                                    Page 8

MR. ERELI: I don't have a comment on it.

QUESTION: Do you have any reaction on the women and children prisoners in Israel?

MR. ERELI: No.

Yeah.

QUESTION: Okay. If the Palestinian factions continue to abduct the Israeli soldier, how would this affect the decision of continuing the aids flow to the Palestinians?

MR. ERELI: I think they are two distinct issues. We have always made clear that our concern is for the -- we've always made clear our concern for the humanitarian welfare of the Palestinian people. I think the tragedy in this instance and in previous actions by the Hamas government is it would appear that by its actions and by its policies Hamas, as a political party and as a movement, puts its narrow partisan interests above and before the interests of the Palestinian people and the humanitarian needs of the Palestinian people. We don't do that.

So regardless of whether the -- regardless of how this -- today's issue is resolved, we're going to continue to give support to the Palestinian people. We're not going to abandon the Palestinian people just because they have a political leadership that's irresponsible and out of step with the rest of the world and the civilized norms that others follow. We have a program of support for the Palestinian people that is independent of an elected government that supports and practices terror.

Yeah.

QUESTION: Change of topic, if I may?

QUESTION: Another one?

QUESTION: Sure.

QUESTION: Do you see any daylight between the political leadership of Hamas which is involved in the government there and the Khaled Meshaal so-called faction, military wing, in Syria? Is there -- do you see any -- I mean, do you see these as two separate --

MR. ERELI: I do see where people try to make those distinctions and talk about that nuance. But you know, the fact of the matter is Hamas is Hamas is Hamas, and the leadership of Hamas, whether they're in Gaza or whether they're in Damascus or whether they're in the West Bank, has to be -- has to answer for the actions of their members.

Yes.

QUESTION: Okay. Citing security concerns and the cost of operations, Romania's Prime Minister announced --

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/29/06 STATEPRELES (No Page)

MR. ERELI: Are we done with --

QUESTION: Yeah.

MR. ERELI: Okay, continue.

QUESTION: Okay, thank you. Announced a proposition to withdraw the 900 Romanians troops from Iraq at the end of this year. I would like to know if the State Department was notified by any channel about this proposition and what would be your reaction.

MR. ERELI: Yeah, you know, I've seen those reports. Frankly, I think the first point to make is that Romania has been and continues to be a strong ally in the global war on terror. Their soldiers from Romania have fought side by side with American and other coalition troops in Iraq and Afghanistan. That contribution has been significant. We greatly value and appreciate it. Romania has performed -- Romania and Romania's soldiers have performed extremely ably and courageously in these missions.

This latest -- these latest reports from Romania are, frankly, a surprise. We hadn't been informed about them. They're certainly not consistent with what we've heard from senior Romanian leadership and I think we'll be looking for clarification.

QUESTION: What do you mean, senior Romanian leadership? The announcement was made by the Prime Minister.

MR. ERELI: Yeah, it's not what we've heard -- we haven't heard that from other leadership before, so we'll be looking for clarification.

QUESTION: Any update about crossing Libya's name from countries that support terrorism?

MR. ERELI: No update. When a decision is made and the appropriate steps taken, we'll let you know.

QUESTION: Is there a briefing tomorrow?

MR. ERELI: If you'd like one.

QUESTION: No, I just wanted -- I just thought all of us would like to say goodbye and wish you well.

MR. ERELI: I'm not gone yet. I'm not gone yet. We'll brief tomorrow, if only to say goodbye.

QUESTION: Change in subject?

MR. ERELI: Uh-huh.

QUESTION: As you know, Turkish Foreign Minister Abdullah Gul is coming to Washington next week.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/29/06 STATEPRELES (No Page)                                              Page 10

MR. ERELI: Yes.

QUESTION: And he will be meeting Secretary Rice on Wednesday.

MR. ERELI: Mm-hmm.

QUESTION: What's the agenda? Do you have anything about it?

MR. ERELI: I think you can look forward to a broad discussion of both bilateral
and regional issues. Obviously, the strategic relationship between Turkey and the
United States is a vital and deep one, so we will be discussing, I think, the full
range of concerns, full range of issues, related to that relationship: Iraq, war
on terror, Iran, our relations with Europe, NATO issues, Afghanistan. You know, a
substantive and meaningful dialogue as befits two important and strategic partners.

Yes.

QUESTION: Adam, the Prime Minister of Serbia paid a visit to Kosovo yesterday and
one of the things he said that Kosovo will always remain part of Serbia. Do you
find that, you know, terribly helpful given the fact that the status of Kosovo is
under international discussion?

MR. ERELI: Yeah, I hadn't seen those comments. I really don't know what they mean.
I think our policy is clear that the future status of Kosovo is for the Kosovars
to decide.

Yes, thank you.

(The briefing was concluded at 1:05 p.m.)

DPB # 109

Released on June 29, 2006

Word Count: 4232
6/29/06 STATEPRELES (No Page)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6/29/06 STATEPRELES (No Page)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Jennifer Ching/PaulWeiss
08/28/2006 03:05 PM

To  Jana Ramsey/PaulWeiss@PaulWeiss

cc

bcc

Subject  Fw: Al-Shareef 05-CV-02458 (JR)

----- Forwarded by Jennifer Ching/PaulWeiss on 08/28/2006 03:05 PM -----



"Andrew.Warden@usdoj.go
v"
<Andrew.Warden@usdoj.go
v>

06/28/2006 02:12 PM

To  Jennifer Ching/PaulWeiss@PaulWeiss

cc

Subject  RE: Al-Shareef 05-CV-02458 (JR)


Jennifer,

Things have been rough in DC the past few days.  However, as you probably
expected, they were not rough enough for us to reconsider our position on the
motions.  We will oppose the production of factual returns and 30 days'
advance notice of transfer.

Best regards,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084
Fax: 202.616.8470

-----Original Message-----
From: JChing@paulweiss.com [mailto:JChing@paulweiss.com]
Sent: Wednesday, June 28, 2006 8:43 AM
To: Warden, Andrew (CIV)
Subject: Al-Shareef 05-CV-02458 (JR)

Andrew,

I write to inform you that Petitioners in the above-captioned case intend to
file a motion (1) seeking at least 30 days' notice of any transfer from
Guantanamo, and (2) compelling the Government to produce their factual
returns.  Please let me know if Respondents will oppose the motion.

I hope the rain/floods have subsided somewhat in DC.

Regards,
Jennifer

Jennifer Ching | Associate

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3384 (Direct Phone) | (212) 492-0384 (Direct Fax)
jching@paulweiss.com | www.paulweiss.com

This message is intended only for the use of the Addressee and may contain
information that is privileged and confidential.  If you are not the intended
recipient, you are hereby notified that any dissemination of this
communication is strictly prohibited.  If you have received this communication
in error, please erase all copies of the message and its attachments and
notify us immediately.



"Terry.Henry@usdoj.g
ov" <Terry.Henry

03/13/2005 07:55 PM

To: Julia Tarver/PaulWeiss@PaulWeiss
cc: Andrea J Prasow/PaulWeiss@PaulWeiss, Jennifer
Ching/PaulWeiss@PaulWeiss, Jay Greenfield/PaulWeiss@PaulWeiss
Subject: RE: TRO/PI in al Joudi (05-CV-00301 (GK)) et al.

We will oppose any TRO/PI motion such as you describe.  I should point out
that to the extent your TRO motion is based on the factual representations
made in the NY Times article from Friday and the Abdah and Doe TRO motions
from this weekend, those factual bases are completely inaccurate, to say the
least.

We will be sending tomorrow an email to a number of counsel who have inquired
regarding this matter.  There is absolutely no need for an immediate TRO
filing, and I would encourage you not to file your motion until you receive my
email tomorrow.

Terry Henry

-----Original Message-----
From: jtarver@paulweiss.com [mailto:jtarver@paulweiss.com]
Sent: Sunday, March 13, 2005 6:09 PM
To: Henry, Terry (CIV)
Cc: jgreenfield@paulweiss.com; JCching@paulweiss.com;
APrasow@paulweiss.com
Subject: TRO/PI in al Joudi (05-CV-00301 (GK)) et al.

RE:    Majid Abdulla al Joudi (05-CV-00301 (GK))
       Yousif Mohammad Mubarak Al-Shehri (05-CV-00301 (GK))
       Abdul-Hakim Abdul-Rahman Al-Moosa (05-CV-00301 (GK))
       Abdulla Mohammad Al Ghanmi (05-CV-00301 (GK))
       Saleh Abdulla Al-Oshan
       Zaben Dhaher Al Shammari
       Abdul Rahman Shalby
       Abdullah Aali Al Otiabi
       Muhammed Fahad Al Qahtany
       Musa Al Madany

Mr. Henry:

Pursuant to Local Rule 65.1(a), I write to advise you that counsel for the
above individuals intend to file an application for a Temporary
Restraining Order and Preliminary Injunctive Relief prohibiting the
Government from transferring our clients from Guantanamo without at least
thirty (30) days' advance notice of any intended removal.  Note that we
will be simultaneously filing a Petition for Writs of Habeas Corpus on
behalf of the six additional detainees named above.

Please advise as soon as possible, by email or phone, whether or not the
Government will oppose such a motion.  You may reach me at (212) 373-3000.
If I am not available, please ask for Andrea Prasow or Jennifer Ching.

Regards,

Julia Tarver, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3029
fax:  (212) 492-0029

This message is intended only for the use of the Addressee and may contain information that is PRIVILEGED and CONFIDENTIAL.

If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

Thank You.



"Terry.Henry@usdoj.g
ov" <Terry.Henry

03/14/2005 05:22 PM

To: Julia Tarver/PaulWeiss@PaulWeiss
cc:
Subject: RE: Guantanamo Bay Detainee Cases

Ms. Tarver:

We cannot agree to notice, as I stated in my earlier e-mail. If you want to
file a PI motion on the subject, as has been done in Abdah and Al Adahi, we
can respond to it. For the reasons stated in my earlier e-mail, there is no
need for a TRO, however. No transfer of any current, individual habeas
petitioner, not already publicly announced and effected, has been scheduled.
And, without commenting with respect to any particular individual petitioner,
any such transfer, even if approved, would be weeks away -- time enough to
address this matter on a PI motion.

If you file your TRO motion, please be sure and include that I provided you
with the representation above.

Sincerely,

Terry Henry
Senior Trial Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
Ph. 202.514.4107

-----Original Message-----
From: jtarver@paulweiss.com [mailto:jtarver@paulweiss.com]
Sent: Monday, March 14, 2005 3:03 PM
To: Henry, Terry (CIV); mfalkoff@cov.com; dremes@cov.com;
taylor.ralph@dorseylaw.com; neil.koslowe@shearman.com;
karen.lee@newyork.allenovery.com; pamela.chepiga@newyork.allenovery.com;
ggutierrez@gibbonslaw.com; jhafetz@gibbonslaw.com;
wesley.powell@cliffordchance.com; Tina.Foster@CliffordChance.com;
Rob.Kirsch@wilmerhale.com; douglas.curtis@wilmerhale.com;
mickum@khlaw.com; behr@khlaw.com; jmargulies@jmrrlaw.com;
mahmad@wcl.american.edu; rwilson@wcl.american.edu; azmybahe@shu.edu;
mgoldman@jenner.com; CHEMERINSKY@law.duke.edu;
Colangelo.Bryan.Joshua@dorsey.com; aaron.stewart@dorsey.com;
katyaln@law.georgetown.edu; JSullivan@perkinscoie.com;
BSharp@perkinscoie.com; KCameron@perkinscoie.com; clivessgb@aol.com;
beane.law@verizon.net; nmoen@fredlaw.com; jdorsey@fredlaw.com;
jlundquist@fredlaw.com
Cc: Anant.Raut@weil.com; skauffman@gsblaw.com; JKitchel@SCHWABE.com;
CEBruce@Venable.com; jdenbeaux@denbeauxlaw.com; LMarjon@aol.com;
newman@lnsn.com; buz.e@verizon.net; susan.manning@bingham.com;
AGustafson@CMHT.com; wmurphy@murphyshaffer.com; egreenberg@gsblaw.com;
david.hickerson@weil.com; greg.smith@sablaw.com; rrachlin@drm.com
Subject: Re: Guantanamo Bay Detainee Cases

Terry -- we appreciate your response and the added assurance it attempts to
provide, but, as I'm sure you can understand, your email falls short of giving
us the comfort we need to forego taking additional steps to ensure the rights
of our clients are not further violated.

Thus, on behalf of Paul, Weiss's clients, we would request that you let us
know by no later than 6:00 pm today whether you would be willing to enter
into, on behalf of the Government -- including the Department of Defense, the

CIA, or any other agencies involved in the transfer of Guantanamo detainees --
a stipulation agreeing that until any preliminary injunction motions we may
file are resolved, none of our clients will be transferred, without at least
10 days' prior notice to the Court and counsel.

Please understand that if, for some reason, you can not give us this
assurance, we will have no other choice but to file our TRO papers today.

We appreciate your prompt attention to this important matter.

Julia Tarver
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

----- Original Message -----
From: "Terry.Henry@usdoj.gov" [Terry.Henry@usdoj.gov]
Sent: 03/14/2005 11:10 AM
To: "mfalkoff@cov.com" <mfalkoff@cov.com>;
"taylor.ralph@dorseylaw.com" <taylor.ralph@dorseylaw.com>; "dremes@cov.com" <dremes@cov.com>;
"neil.koslowe@shearman.com" <neil.koslowe@shearman.com>;
"karen.lee@newyork.allenovery.com" <karen.lee@newyork.allenovery.com>;
"pamela.chepiga@newyork.allenovery.com"
<pamela.chepiga@newyork.allenovery.com>;
<ggutierrez@gibbonslaw.com>; "jhafetz@gibbonslaw.com" "ggutierrez@gibbonslaw.com"
<jhafetz@gibbonslaw.com>; "wesley.powell@cliffordchance.com"
<wesley.powell@cliffordchance.com>;
<Tina.Foster@CliffordChance.com>; "Rob.Kirsch@wilmerhale.com" "Tina.Foster@CliffordChance.com"
<Rob.Kirsch@wilmerhale.com>; "douglas.curtis@wilmerhale.com"
<douglas.curtis@wilmerhale.com>; "mickum@khlaw.com" "mickum@khlaw.com>;
"behr@khlaw.com" <behr@khlaw.com>; "mickum@khlaw.com" <mickum@khlaw.com>;
<jmargulies@jmrrlaw.com>; "jmargulies@jmrrlaw.com" "jmargulies@jmrrlaw.com"
"rwilson@wcl.american.edu" <rwilson@wcl.american.edu>; "mahmad@wcl.american.edu>;
<azmybahe@shu.edu>; "mgoldman@jenner.com" "mgoldman@jenner.com>; "azmybahe@shu.edu"
"CHEMERINSKY@law.duke.edu" <CHEMERINSKY@law.duke.edu>;
"Colangelo.Bryan.Joshua@dorsey.com" <Colangelo.Bryan.Joshua@dorsey.com>;
"aaron.stewart@dorsey.com" <aaron.stewart@dorsey.com>;
"rob.kirsch@wilmerhale.com" <rob.kirsch@wilmerhale.com>;
"katyain@law.georgetown.edu" <katyain@law.georgetown.edu>;
"JSullivan@perkinscoie.com" <JSullivan@perkinscoie.com>;
"BSharp@perkinscoie.com" <BSharp@perkinscoie.com>; "KCameron@perkinscoie.com"
<KCameron@perkinscoie.com>; "clivessgb@aol.com" <clivessgb@aol.com>;
"beane.law@verizon.net" <beane.law@verizon.net>; "nmoen@fredlaw.com"
<nmoen@fredlaw.com>; "jdorsey@fredlaw.com" <jdorsey@fredlaw.com>;
"jlundquist@fredlaw.com" <jlundquist@fredlaw.com>; "dschneider@fredlaw.com"
<dschneider@fredlaw.com>; "dfoster@fredlaw.com" <dfoster@fredlaw.com>;
"atareen@fredlaw.com" <atareen@fredlaw.com>; "jsherman@fredlaw.com"
<jsherman@fredlaw.com>; "gthunt@mdo.net" <gthunt@mdo.net>;
"PReichler@Foleyhoag.com" <PReichler@Foleyhoag.com>; "JMonast@foleyhoag.com"
<JMonast@foleyhoag.com>; "SAltschuller@foleyhoag.com"
<SAltschuller@foleyhoag.com>; "LMartin@foleyhoag.com" <LMartin@foleyhoag.com>;
"stephmac@earthlink.net" <stephmac@earthlink.net>;
"marjoriemsmith@verizon.net" <marjoriemsmith@verizon.net>
Cc: "Anant.Raut@weil.com" <Anant.Raut@weil.com>;
<skauffman@gsblaw.com>; "JKitchel@SCHWABE.com" "skauffman@gsblaw.com";
"CEBruce@Venable.com" <CEBruce@Venable.com>; "JKitchel@SCHWABE.com"
<jdenbeaux@denbeauxlaw.com>; "LMarjon@aol.com" "jdenbeaux@denbeauxlaw.com"
"newman@lnsn.com" <newman@lnsn.com>; "LMarjon@aol.com";
"susan.manning@bingham.com" <susan.manning@bingham.com>; "AGustafson@CMHT.com"

<AGustafson@CMHT.com>; "wmurphy@murphyshaffer.com"
<wmurphy@murphyshaffer.com>; "egreenberg@gsblaw.com"
"david.hickerson@weil.com" <david.hickerson@weil.com>; "greg.smith@sablaw.com";
<greg.smith@sablaw.com>; "cebruce@venable.com" <cebruce@venable.com>;
"rrachlin@drm.com" <rrachlin@drm.com>; Julia Tarver,PaulWeiss@PaulWeiss
Subject: Guantanamo Bay Detainee Cases

Dear Counsel:

A number of you have inquired regarding or stated your intention to seek TROs
either restraining any transfer of petitioners from Guantanamo Bay (GTMO) or
conditioning such transfer on notice being given to you beforehand.  These
inquiries appear to have been based on an article in the Friday New York
Times, as well as a TRO sought by counsel in Abdah, after hours on Friday and
without the notice to the government contemplated under the Local Rules.  The
TRO was granted on Saturday afternoon, again without prior notice of any kind
to the government.

I am writing to inform you that, while the government will not consent to
motions for TRO or PI seeking to restrain transfers or condition them upon
notice, there is no legitimate factual basis or need for TROs in this matter.
The impression counsel have drawn from the NY Times article that the
Department of Defense (DoD) intends to immediately transfer or begin
transferring hundreds of GTMO detainees to various countries is erroneous.  It
is likewise erroneous that DoD is undertaking any transfer of GTMO detainees
in order to defeat the court's jurisdiction.  Further, the transfer of three
detainees on Saturday involved the transfer, for release, of detainees
determined no longer to be enemy combatants.

No transfer of any current, individual habeas petitioner, not already publicly
announced and effected, has been scheduled.  Without commenting with respect
to any particular individual petitioner, any such transfer, even if approved,
would be weeks away.  Had counsel in Abdah complied with the Local Rules by
affording the government notice of the TRO motion in that case prior to its
filing or entry of the TRO, we could have provided this same information to
counsel and the Court.

The government's position regarding transfers and prior notice of transfers is
reflected in its recent filings in El Mashad, Abdah, and Al Adahi.  In any
event, however, there is no legitimate factual basis justifying TROs in
relation to this matter.

Sincerely,

Terry Henry
Senior Trial Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
Ph. 202.514.4107

This message is intended only for the use of the Addressee and may
contain information that is PRIVILEGED and CONFIDENTIAL.

If you are not the intended recipient, you are hereby notified that any
dissemination of this communication is strictly prohibited. If you have
received this communication in error, please erase all copies of the
message and its attachments and notify us immediately.

Thank You.

# EXHIBIT D



**U.S. Department of Defense**
Office of the Assistant Secretary of Defense (Public Affairs)

# News Release

On the Web:
http://www.defenselink.mil/Releases/Release.aspx?ReleaseID=9869
Media contact: +1 (703) 697-5131/697-5132

Public contact:
http://www.dod.mil/faq/comment.html
or +1 (703) 428-0711 +1

---

**IMMEDIATE RELEASE**

No. 814-06
August 26, 2006

---

### Detainee Transfer Announced

The Department of Defense announced today that it transferred five detainees from Guantanamo Bay, Cuba, to Afghanistan. These detainees were all recommended for transfer due to multiple review processes conducted at Guantanamo Bay.

With today's transfer, approximately 120 detainees remain at Guantanamo who the U.S. government has determined eligible for transfer or release through a comprehensive series of review processes. Departure of these remaining detainees approved for transfer or release is subject to ongoing discussions between the United States and other nations. The United States does not desire to hold detainees for any longer than necessary. The department expects that there will continue to be other transfers and releases of detainees.

There are ongoing processes to review the status of detainees held at Guantanamo. A determination about the continued detention or transfer of a detainee is based on the best information and evidence available at the time, both classified and unclassified.

With this transfer, approximately 315 detainees have departed Guantanamo for other countries, including Albania, Afghanistan, Australia, Bahrain, Belgium, Denmark, Egypt, France, Germany, Iran, Iraq, Jordan, Kuwait, Maldives, Morocco, Pakistan, Russia, Saudi Arabia, Spain, Sweden, Sudan, Tajikistan, Turkey, Uganda, United Kingdom, and Yemen.

Approximately 445 detainees remain at Guantanamo.

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Omar ABU ALI and Fatca ABU ALI,          )
   as Next Friends of                      )
Ahmed ABU ALI,                            )
   presently detained in Saudi Arabia, his )
   residence and that of his Next Friends is )
   3245 Rio Drive, Apt. 1015               )
   Falls Church, VA 22041                  )
       Petitioners                     )
                                          )
                                          )
v.                                        )
                                          )
John ASHCROFT, Attorney General of the    )
   United States;                          )
Robert S. MUELLER, III, Director of the   )
   Federal Bureau of Investigation;        )
Luke KULISGOSKI, Special Agent, Federal   )
   Bureau of Investigation;                )
Other Special Agents of the FBI to be     )
   Identified and Named;                   )
Thomas RIDGE, Secretary of the            )
   Department of Homeland Security; and    )
Colin POWELL, United States Secretary     )
   of State,                               )
       Respondents                     )
                                          )
                                          )

Civil Action No. 1-94-cv-01258 JDB

Judge John D. Bates

PETITION FOR
HABEAS CORPUS

AFFIDAVIT OF **Brian Evans**

I, **Brian Evans**, hereby make the following declaration with respect to the

above-captioned case:

I am the Saudi Arabia, Bahrain, and Oman Country Specialist for Amnesty International USA (AIUSA). I have a Master's Degree in Middle East Studies from the University of Texas at Austin. In my AIUSA capacity I am charged with monitoring the human rights situation in Saudi Arabia, Bahrain and Oman. I monitor, assist with, and respond to U.S. media coverage of human rights issues in these countries. I interview victims and witnesses of human rights violations in these countries when they are here in the U.S., and testify, or prepare testimony for AIUSA representatives to U.S. government agencies or officials concerned with human rights issues in these countries.

i

I was first contacted by the family of Ahmed Abu Ali by email in August 2003. They were concerned for his safety both because of Saudi Arabia's reputation for torturing or otherwise abusing detainees, and because of a perceived lack of interest in protecting his rights on the part of U.S. consular officials. Amnesty International has written to U.S. and Saudi Arabian officials seeking clarification of the reasons for Ahmed Abu Ali's detention and seeking assurances that he will not be mistreated, and AIUSA has mobilized its activist members to write these same authorities seeking the same information.

Responses from U.S. officials have been limited to general assurances that Ahmed Abu Ali's rights will be protected; the Privacy Act has been cited as reason for not disclosing more specific information about Ahmed Abu Ali's detention, or any U.S. role in his detention, interrogation, or in protecting his rights. It is not clear that Mr. Abu Ali has ever been given the right to waive his rights under the Privacy Act.

As an expert on human rights practices in Saudi Arabia, I submit this affidavit to emphasize the Ahmed Abu Ali remains seriously at risk as long as he remains in detention in Saudi Arabia.

The Saudi Arabian criminal justice system is fundamentally lacking in the basics of due process. The legal protections that do exist in principle in Saudi Arabia, most of which were only enacted in 2002, can be and are easily ignored in high profile cases. In practice, there is no right to a defense attorney or a public trial, or indeed a trial of any kind. Saudi Arabian authorities continue to hold detainees indefinitely without charge or trial. For example, Sa'd ibn Sa'id Al Zu'air has been detained since July of 2002, in connection with his efforts to campaign for the release of his father, a prominent critic of the Saudi Arabian government. Since July 2002 no one, not even his family, has received any information about his status, whereabouts or health. He may or may not have been tried, convicted and sentenced on unknown charges. In this case, as in many others, the legal reforms of 2002 have proved meaningless. (see *Saudi Arabia: Justice must be seen to be done*, AI Index: MDE 23/016/2004, 1 August 2004) – all Amnesty International documents, including Annual Report entries, are available on the Amnesty International website at: http://web.amnesty.org/library/eng-sau/index )

In the trials that do take place, confessions are considered of paramount importance, and the use of torture or other forms of ill-treatment to extract confessions is commonplace. A lack of judicial supervision over detaining authorities allows torture to take place with impunity.

Citizens of Western countries are not safe from these abuses. In August, 2003, five British and one Canadian national were released from Saudi Arabia custody following a royal pardon that was obtained by the personal intervention of British Prime Minister Tony Blair. They had been convicted of a series of bombings of Western country nationals that took place in November 2000. Two of the men, William Sampson (Canadian) and Alexander Mitchell (British), were sentenced to death by beheading. The primary evidence for their convictions were confessions, two of which were broadcast on television in February 2001, before the trials had even taken place. The released men claim these confessions were extracted under torture. Methods of torture cited by these men include beatings all over the body and beatings with sticks on the soles

2

of the feet, sleep deprivation, and shackling and handcuffing for long periods.  (see *Amnesty International Report 2004*)

Other methods of torture described to Amnesty International by victims in recent years have included electric shocks, cigarette burns and nail pulling. (see *Saudi Arabia: Culture of Brutality*, AI Index MDE 23/10/00, 1 June 2000)

The U.S. government clearly recognizes the danger to those detained in Saudi Arabia, saying the following about Saudi Arabia in the latest State Department Country Report on Human Rights Practices: "there were credible reports that the authorities abused detainees, both citizens and foreigners. Ministry of Interior officials were responsible for most incidents of abuse of prisoners, including beatings, whippings, and sleep deprivation. In addition, there were allegations of torture, including allegations of beatings with sticks and suspension from bars by handcuffs. There were reports that torture and abuse were used to obtain confessions from prisoners." (see U.S. Department of State. *Country Reports on Human Rights Practices 2003: Saudi Arabia*, http://www.state.gov/g/drl/rls/hrrpt/2003/27931.htm )

Though not mentioned in its most recent report, the U.S. State Department has also reported in recent years that " . . . authorities tortured detainees and pressured them to confess by isolation, blindfolding, and drugging over a period of weeks." (see U.S. Department of State. *Country Reports on Human Rights Practices 2001: Saudi Arabia*, http://www.state.gov/g/drl/rls/hrrpt/2001/nea/8295.htm )

Despite the secrecy under which Saudi Arabian criminal justice is conducted, Amnesty International has documented many cases of torture including the following examples:

- Muhammad Rajkhan, a Saudi Arabian national, reportedly suffered damage to his eardrum and loss of weight as a result of torture and ill-treatment following his arrest in February 2003. (see *Amnesty International Report 2004*)

- In August 2001, a group of Christian foreign nationals from India and East Africa, were detained and, upon their release, provided the following testimony to Amnesty International: "On January 28, 2002...by order of the Bramam Prison commander ...we were illegally subjected to severe punishment and physical abuse. Being suspended with chains, each of us were flogged 80 times with a flexible metal cable, and also severely kicked and beaten with anything that came into their hands...Our bodies are wounded, swollen, terribly bruised, and with great pain. Bekuru [Mengistu, Ethiopian national]'s kidney may have been damaged and he is passing blood with his urine." (see *Saudi Arabia Remains a Fertile Ground for Torture with Impunity*, AI Index: MDE 23/004/2002, 1 May 2002)

- Kalesh, an Indian national who was accused of theft and held in incommunicado detention, stated following his release in December 2000: "There were three people in civilian dress...They had a big stick with ropes at each end... I was asked to sit on the floor... At this time I am handcuffed and chained in my legs. The stick with the ropes was inserted through the folding of my knees...and the ropes were tied to my handcuffed hands. I became like a football... I was sitting/lying on the floor and these three devils...

3

started kicking and beating me brutally with the rod... There are still marks... of that day on my body . . ." (see *Amnesty International Report 2002*)

Ahmed Abu Ali has no legal protections from this kind of abuse in Saudi Arabia. As long as Ahmed Abu Ali remains in Saudi Arabia, his legal rights, and indeed his physical safety, remain seriously at risk.

I declare, under penalty of perjury, that the foregoing is true and correct.

Signed and affirmed to this 17th day of September, 2004, in _Irving_, TX by:

_____
Name

Sworn and subscribed to before me this 17th day of September, 2004 in _Irving_, TX

_____
Notary Public

My commission expires: 6/7/08

4