**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FAHD UMAR ABDULMAJID AL-<br>    SHAREEF, et al., <br><br>              Petitioners, <br>     v. <br><br> GEORGE W. BUSH, et al., <br><br>              Respondents. | Civil Action No. 05-2458 (RWR) |

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO PETITIONERS'**
**MOTION FOR PRELIMINARY INJUNCTION REQUIRING**
**ADVANCE NOTICE OF ANY TRANSFER OR RELEASE**

Respondents hereby oppose petitioners' motion for preliminary injunction requiring

respondents to provide the Court and petitioners' counsel with 30 days' advance notice before

any transfer or release of petitioners Fahd Umar Abdulmajid Al-Shareef and Hani Saeed

Mohammed Bana Al-Kalf Al-Gamdi from Guantanamo Bay, Cuba ("Guantanamo").[1]

Petitioners' motion should be denied because the Detainee Treatment Act of 2005, Pub.

L. No. 109-148, Tit. X, 119 Stat. 2680 ("the Act"), vests exclusive jurisdiction over this action in

the Court of Appeals.  The Act, among other things, amends 28 U.S.C. § 2241 to eliminate court

jurisdiction to consider petitions for writ of habeas corpus and other claims by aliens held as

enemy combatants at Guantanamo Bay, id., § 1005(e)(1), and creates an exclusive review

mechanism in the D.C. Circuit to address the validity of the detention of such aliens and final

decisions of any military commissions, id., § 1005(e)(1), (e)(2), (e)(3).  Section 1005(e)(2) of the

---

[1] The issue of whether advance notice orders are proper is currently pending at the D.C. Circuit, with oral argument scheduled for September 11, 2006. See Kiyemba v. Bush, No. 05-1509 (RMU) (D.D.C. Sept. 13, 2005), appeal petition from interlocutory appeal, No. 05-5487 (D.C. Cir.).

Act states that the D.C. Circuit "shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and it further specifies the scope and intensiveness of that review.  While the Supreme Court in Hamdan v. Rumsfeld, 126 S. Ct. 2749, 2762-2769 (2006), held that § 1005(e)(1) of the Detainee Treatment Act did not apply to habeas petitions pending prior to the enactment of the Act, it recognized that the exclusive review provisions of the Act did expressly apply to cases pending prior to enactment.  Although the petitioner in Hamdan escaped the Act because his challenge did not involve a final decision of a military commission within the exclusive jurisdiction of the Court of Appeals under § 1005(e)(3), the Court reserved the question of the effect of the exclusive review provisions of the Act on other cases, stating that "[t]here may be habeas cases that were pending in the lower courts at the time the DTA was enacted that do qualify as challenges to 'final decision[s]' within the meaning of subsection (e)(2) or (e)(3).  We express no view about whether the DTA would require transfer of such an action to the District of Columbia Circuit."  Hamdan, 126 S. Ct. at 2769 n.14.

The above-captioned case is such a case, i.e., challenging petitioners' designation as an enemy combatant through the Combatant Status Review Tribunal.  Given the Act's investment of exclusive review in the Court of Appeals, the District Court lacks jurisdiction over this case for it is well-settled that an exclusive-review scheme, where applicable, precludes the exercise of jurisdiction under more general grants of jurisdiction, including habeas corpus.  Cf., e.g., 5 U.S.C. § 703 ("form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for . . . writs of . . . habeas

2

corpus"); <u>Thunder Basin Coal Co. v. Reich</u>, 510 U.S. 200, 207-09 (1994) ("exclusive"

jurisdiction under federal Mine Act precludes assertion of district court jurisdiction); <u>FCC v. ITT</u>

<u>World Commc'ns, Inc.</u>, 466 U.S. 463, 468 (1984) (Hobbs Act) ("The appropriate procedure for

obtaining judicial review of the agency's disposition of these issues was appeal to the Court of

Appeals as provided by statute."); <u>Laing v. Ashcroft</u>, 370 F.3d 994, 999-1000 (9th Cir. 2004) ("§

2241 is ordinarily reserved for instances in which no other judicial remedy is available"); <u>Lopez</u>

<u>v. Heinauer</u>, 332 F.3d 507, 511 (8th Cir. 2003) ("Because judicial review was available . . . the

district court was not authorized to hear this § 2241 habeas petition.").  See <u>also</u> <u>Telecomm.</u>

<u>Research and Action Ctr. v. FCC</u>, 750 F.2d 70, 77 (D.C. Cir. 1984) ("even where Congress has

not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction

in a particular court cuts off original jurisdiction in other courts in all cases covered by that

statute") (footnote omitted); <u>id.</u> at 75, 78-79 (request for relief in district court that might affect

Court of Appeals' future, exclusive jurisdiction is subject to the exclusive review of the Court of

Appeals).  The relief requested by petitioners would require an assertion of jurisdiction and

authority in the case inconsistent with the Act's investment of exclusive jurisdiction in the Court

of Appeals, and respondents' argument in this regard is in no way immaterial or premature.  See

<u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94 (1998) ("Without jurisdiction [a] court

cannot proceed at all in any cause."); <u>see</u> <u>also</u> <u>Ex parte McCardle</u>, 74 U.S. (7 Wall.) 506, 514

(1869) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function

remaining to the court is that of announcing the fact and dismissing the cause.").

       Thus, the Supreme Court's decision in <u>Hamdan</u> has not resolved the issue of whether this

Court may exercise jurisdiction in this case in light of the Act.  The effect of the Act on cases like

this remains pending before the Court of Appeals in the pending Guantanamo detainee appeals (see Boumediene v. Bush, Nos. 05-5062 and Al Odah v. United States, No. 05-5064), and the effect of Hamdan on this issue is being addressed in supplemental briefing to the Court of Appeals, to be completed by August 15, 2006. Accordingly, while petitioners' request for relief should be denied, at a minimum, a stay of proceedings in this case including with respect to petitioners' request for relief, is appropriate pending the resolution of the effect of the Act by the Court of Appeals. For these reasons, respondents oppose petitioners' request for relief.[2] Furthermore, respondents also oppose petitioners' request for relief for the reasons discussed below.

## BACKGROUND

**A.     Detention of Enemy Combatants at Guantanamo**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as Commander in Chief and with congressional authorization, see Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and others that had supported it. In the course of those hostilities, the United States has captured or taken custody of a number of foreign nationals as enemy combatants, some of whom are being held at Guantanamo.

---

[2] Although this Court has entered orders requiring advance notice of transfer of Guantanamo detainees, respondents respectfully oppose petitioners' request for such an order for the reasons explained herein.

**B.      Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo**

Although the laws of war permit the United States to hold enemy combatants in detention for the duration of hostilities, the United States has no interest in detaining any individuals longer than necessary.  See Decl. of then Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3; Decl. of then Ambassador Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2.[3]  The Department of Defense ("DoD") conducts at least annual reviews of each Guantanamo detainee to determine whether continued detention is warranted based on factors such as whether the detainee continues to pose a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  Those annual reviews include those currently being conducted through Administrative Review Boards.  See Waxman Decl. ¶¶ 3, 7.[4]  As part of the Administrative Review Board process, counsel who represent detainees have been invited to make written submissions concerning whether further detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised, any concerns about transfer or repatriation, and have in fact made such submissions.

---

[3] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar motions in other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The Prosper Declaration submitted herewith was originally submitted in connection with a similar motion in Abdah v. Bush, Civ. A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005).  While Mr. Waxman and Mr. Prosper have both recently left office, the policies and practices set forth in their prior declarations remain in effect and are applicable to the instant case.  Certain numerical information in the declarations is subject to updating.  See infra note 5.

[4] See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004, re: Admin. Review Procedures for Enemy Combatants in the Control of the DoD at Guantanamo Bay Naval Base, Cuba, available at <<http://www.defenselink.mil/news/May2004/d20040518 gtmoreview.pdf>>; Memorandum dated Sept. 14, 2004, re: Implementation of Admin. Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, available at <<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

Following consultation with various agencies, a senior Department of Defense official grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another government. Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7. Several hundred Guantanamo detainees have been so transferred, over a period spanning several years. Waxman Decl. ¶ 4; Prosper Decl. ¶ 2.[5]

Where continued detention by the United States is not warranted, a detainee may be transferred to the control of another government, typically the government of his country of citizenship, for release. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government. Waxman Decl. ¶ 5. The purpose of such dialogue is to ascertain or establish what

---

[5] As an update to certain information provided in the attached declarations approximately 315 detainees have been transferred by the DoD from Guantanamo, of which approximately 190 were transferred for release. See, e.g., DoD News Releases available at <<http://www.defenselink.mil/news/nrdgb.html>>.

measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies.  Id.  In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States.  Id.  Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States.  Id.  In fact, most of the Guantanamo detainees who have been transferred by the DoD to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer.  Id.

     In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the DoD approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 6.  Such discussions include an effort to seek assurances that the United States Government considers necessary and appropriate for the country in question, including assurances of humane treatment and treatment in accordance with the international obligations of the foreign government

accepting transfer.  Id.  Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues more specific assurances if the nation concerned is not a party or other circumstances warrant.  Id.

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  Recommendations by the State Department are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the State Department's annual Country Reports on Human Rights Practices) and the relevant State Department regional bureau, country desk, or U.S. Embassy.  Prosper Decl. ¶ 7.  When evaluating the adequacy of assurances, State Department officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States. Prosper Decl. ¶ 8.  In an appropriate case, the State Department may consider various monitoring mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that

government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl.

¶ 8.  Indeed, circumstances have arisen in the past where the DoD decided not to transfer

detainees to their country of origin because of mistreatment concerns.  Waxman Decl. ¶ 7;

Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government

depends on its ability to treat its dealings with the foreign government with discretion.  Prosper

Decl. ¶ 9; Waxman Decl. ¶ 8.  Obviously, diplomatic sensitivities surround the Department of

State's communications with foreign governments concerning allegations relating to torture.

Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government typically does not

unilaterally make public any specific assurances or other precautionary measures obtained,

because such disclosure would have a chilling effect on and cause damage to our ability to

conduct foreign relations.  Prosper Decl. ¶ 9.  If the United States Government were required to

disclose its communications with a foreign government relating to particular mistreatment or

torture concerns outside appropriate Executive Branch channels, that government and potentially

other governments would likely be reluctant to communicate frankly with the United States

concerning such issues in the future.[6]  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result,

disclosure could impede our country's ability to obtain vital cooperation from concerned

governments with respect to military, law enforcement, and intelligence efforts related to the war

---

[6] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker.  Prosper Decl. ¶ 11.  Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials.  Id.

on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

## ARGUMENT

**I.      PRELIMINARY INJUNCTION STANDARD**

It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'"  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  Id. (citations and internal quotation marks omitted; emphasis in original).[7]

---

[7] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings related appeals.  However, as one Judge of this Court has concluded, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the

(continued...)

## II.    PETITIONERS FAILS TO SHOW IRREPARABLE INJURY

### A.    The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction

Petitioners argue that a preliminary injunction requiring advance notice is necessary because: 1) if removed without an opportunity to challenge their removal, petitioners might face potential detention by the country to which they are transferred, and 2) a transfer would or could extinguish the transferred detainee's habeas claims and curtail the Court's review of the legality of his transfer.  See Pet'rs' Br. at 7.  Petitioners' argument, however, rests on faulty logic.  The ultimate relief sought by petitioners in this habeas case is obviously release from custody.  Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is interested in maintaining.[8]  "The ultimate objective of a habeas petition is release from custody."  Almurbati

---

[7](...continued)
backdoor of a stay."  Al-Anazi v. Bush, 370 F. Supp. 2d 188, 199 n.11 (D.D.C. 2005) (citing Laborers' Int'l Union of N. Am. v. Nat'l Post Office Mail Handlers, Civ. A. No. 8801731-OG, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)).  Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioners seek might be embodied, petitioners should be required to satisfy the preliminary injunction standard in order to justify that relief.

[8] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October 2002, long before the Supreme Court's decision in Rasul v. Bush, 524 U.S. 466 (2004), and the proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  It has been noted that 131 transfers (i.e., more than half of the transfers to date) had occurred three months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts."  Al-

(continued...)

v. Bush, 366 F. Supp. 2d 72, 78 (D.D.C. 2005).  As one Judge of this Court stated, "once the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction."  Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas petition, including this one, is ultimately about obtaining release from detention, and where, as here, the United States will relinquish custody of the detainee to the home government there is nothing more the Court could provide to petitioners.") (citation omitted).

That release from United States custody will give petitioners all the relief they can seek through habeas is not altered by the fact that, upon being released from the custody of the United States, former detainees may be taken into custody and detained in the receiving country based on that country's independent interests and determinations.  As respondents' declarations make clear, when the DoD transfers detainees to the control of other governments, the detainees are no longer subject to the custody or control of the United States, and any subsequent confinement in the receiving country is based on the receiving government's independent decision, based on its domestic laws, that the individual should be detained.  Waxman Decl. ¶ 5.  Indeed, even if the United States transfers a detainee to his home government with the understanding that, from the United States' perspective, he can be released, the home government may well subsequently take any law enforcement or investigatory action against the former detainee that it may deem appropriate under its laws.  The Court should therefore reject petitioners' suggestion that the

---

[8](...continued)

Anazi, 370 F. Supp. 2d at 196 n.7 (citing DoD, Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004)); see also supra note 3 (citing documents showing that administrative review process for considering transfers and repatriations predates the filing of this and most other detainee habeas petitions).

possibility of future detention in an individual's home or another country based on that country's

independent interests and determinations constitutes irreparable injury warranting an injunction.

      **B.**     **Speculation that the United States Will Defy its Own
Policy by Transferring Detainees to Countries in
Circumstances Where it is Believed They Will be Tortured
Does Not Warrant a Preliminary Injunction**

Nor can petitioners carry their burden to show irreparable injury that is "certain and great

. . . actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985),

by rife speculation that, contrary to the policies and processes attested to in the sworn

declarations of high-level Executive Branch officials, the United States has designs to send

petitioners to a foreign country under circumstances where they will be tortured. Those

declarations, after all, make clear that it is the policy of the United States not to repatriate or

transfer a detainee to a country when the United States believes, based on a number of factors

and considerations, it is more likely than not that the individual will be tortured there. Prosper

Decl. ¶ 4; Waxman Decl. ¶ 6. This policy is implemented through a process that contains several

levels of precautions and safeguards. To conclude that an injunction is nevertheless necessary

would require the Court to assume, without any evidence, that the United States' policy and

practice is somehow a sham or pretext. There is no valid basis for such an assumption.

Rather, as one Judge of this Court has found, respondents' sworn declarations "directly

refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention

to which the United States will in some way be complicit." Almurbati, 366 F. Supp. 2d at 78.

Moreover, another Judge of this Court found that the assortment of magazine and newspaper

stories relied upon by many detainee-petitioners in these cases failed to form a factual predicate

13

justifying an injunction, noting that, among other problems with relying on such materials,
"[p]etitioners [in that case] concede that none of these incidents involve the transfer of detainees
out of Guantanamo."  Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196.  Thus, petitioners
have failed to show that either the prospect of relinquishment from United States custody or
unfounded speculation about possible torture in a foreign country constitutes irreparable harm
that must be remedied by a preliminary injunction.

III.    **PETITIONERS CANNOT SHOW A LIKELIHOOD OF SUCCESS
        IN OBTAINING A COURT ORDER PREVENTING A TRANSFER
        OR RELEASE IN ACCORDANCE WITH THE POLICIES
        EXPRESSED IN RESPONDENTS' DECLARATIONS**

        Petitioners fare no better on the second prong of the preliminary injunction analysis,
which requires them to show that they are likely to succeed in preventing a transfer from
Guantanamo.

        To be clear, aside from the withdrawal of district court habeas jurisdiction in this case
under the Detainee Treatment Act, see supra, whatever the merits of petitioners' substantive
claims that they are wrongfully detained, it is not the likelihood of success on those claims that
matters for purposes of the instant motion for preliminary injunction.  Rather, as two Judges of
this Court (who reached opposite outcomes on the bottom line of whether to require advance
notice) have agreed, the likelihood of success analysis must focus on the legal basis for petitioner
to obtain an order preventing termination of detention by the United States in the manner
described in the declarations submitted herewith.  See Al-Anazi, 370 F. Supp. 2d at 194 ("[T]he
presence of a sound basis to challenge the legality of one's detention does not at all imply that
there exists a sound basis to challenge the legality of one's transfer.  Put differently, the 'merits,'

14

if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their <u>transfer</u> from Guantanamo, not to their <u>detention</u> at Guantanamo) (emphasis in original); <u>Abdah</u>, 2005 WL 711814, at *4 ("<u>if</u> there are no circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted") (emphasis in original).

Petitioners fail to identify any valid source of legal authority for such an order; instead, they ignore the above teaching and simply insists that they are likely to succeed on the types of claims challenging <u>detention</u> that were raised in the cases before Judge Green in <u>In re Guantanamo Detainee Cases</u>, 355 F. Supp. 2d 443 (D.D.C. 2005), <u>appeal on pet. from interlocutory appeal</u>, No. 05-5064 (D.C. Cir)  Moreover, even if a valid source of legal authority existed for an order prohibiting a <u>transfer</u>, the Rule of Non-Inquiry, which bars judicial inquiry into the fairness of a foreign nation's justice system and the procedures or treatment that an individual may experience in a foreign nation, weighs heavily against petitioners' likelihood of success in contesting a transfer or repatriation.

> **A.      No Valid Legal Basis Exists for a Judicial Order Enjoining Transfer or Repatriation of an Individual Previously Detained by the United States as an Enemy Combatant**

As discussed above in the context of irreparable harm, <u>see</u> <u>supra</u> Section II. A, preservation of the Court's jurisdiction would not be an appropriate legal rationale for an order forbidding transfer or repatriation of an individual detained at Guantanamo, because relinquishment from United States custody (which occurs in every such transfer or repatriation) represents the full extent of relief that petitioners could obtain from a habeas petition.  <u>See</u> <u>Almurbati</u>, 366 F. Supp. 2d at 80 ("[O]nce the respondents release the petitioners from United

States custody . . . they will have obtained the result requested and at that point there will be no

further need for this Court to maintain jurisdiction."); see also Al-Anazi, 370 F. Supp. 2d at 198.[9]

Indeed, it has been noted that, "[w]ere the Court to preserve its jurisdiction over the habeas

petitions, and ultimately determine that the United States may no longer detain the petitioners,

the parties and the Court would find themselves in precisely the same position in which they find

themselves now – with the respondents taking steps to transfer those individuals out of United

States control, and the petitioners compelled to come forward with some legal or evidentiary

basis to prevent transfer to an 'undesirable' country." Al-Anazi, 370 F. Supp. 2d at 196. Thus,

petitioners do not enjoy a likelihood of success in obtaining an order barring a transfer in order to

"protect" the Court's jurisdiction.

### B. Principles Underlying the Rule of Non-Inquiry Militate Heavily Against Petitioners' Likelihood of Success

Even if some valid claim or other legal basis existed for judicial involvement in transfer

or repatriation decisions with respect to enemy combatants held abroad, or for an advance notice

requirement to support and facilitate such involvement, the separation of powers would bar such

relief. "[I]t is beyond the judicial function for a court to review foreign policy decisions of the

Executive Branch." People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999)

---

[9] One of the previous decisions on a similar motion in another Guantanamo detainee case criticized this proposition as "overly simplistic," because "[p]etitioner ultimately seeks total freedom from all custody, not just United States custody." Al-Marri v. Bush, Civ. A. No. 04-2035, 2005 WL 774847, at *3 n.7 (D.D.C. Apr. 4, 2005). Whatever petitioners may ultimately seek, however, a court of the United States clearly does not have jurisdiction to award a foreign national the relief of "freedom from all custody" worldwide, in the sense of immunity from detention in his home or a third country pursuant to its own domestic laws and independent determinations. It is beyond cavil that the courts of the United States would have no authority to interfere with any decision a foreign sovereign nation may make to detain, investigate, or prosecute its own nationals being returned to it.

(citing Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103 (1948)); see

also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he

controlling considerations are the interacting interests of the United States and of foreign

countries, and in assessing them [the courts] must move with the circumspection appropriate

when [a court] is adjudicating issues inevitably entangled in the conduct of our international

relations.'") (quoting Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 383 (1959)).[10]  If

the Court were to entertain petitioners' claim to a right to contest repatriation or removal from

Guantanamo, it would insert itself into the most sensitive of diplomatic matters.  Judicial review

of a transfer or repatriation decision could involve scrutiny of United States officials' judgments

and assessments on the likelihood of torture in a foreign country, including judgments on the

reliability of information and representations or the adequacy of assurances provided, and

confidential communications with the foreign government and/or sources therein.  Prosper Decl.

¶¶ 9-12.  Disclosure and/or judicial review of such matters could chill important sources of

information and interfere with our ability to interact effectively with foreign governments.

Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign government in question, as

well as other governments, would likely be reluctant to communicate frankly with the United

States in the future concerning torture and mistreatment concerns.  Prosper Decl. ¶¶ 10, 12.  This

---

[10] In Holmes, U.S. citizen servicemembers sued to prevent the United States government
from surrendering them to West German authorities to serve sentences for convictions by West
German courts on criminal charges relating to their conduct while stationed in West Germany.
Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the
plaintiffs' invitation to examine the fairness of their treatment by the West German courts and
declined to enjoin the transfer, the latter court holding that "the contemplated surrender of
appellants to the Federal Republic of Germany is a matter beyond the purview of this court."  459
F.2d at 1225.

chilling effect would jeopardize the cooperation of other nations in the war on terrorism.  Prosper
Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the
analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a
requesting nation's justice system'" and "'the procedures or treatment which await a surrendered
fugitive in the requesting country.'"  United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir.
1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983));
see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the
extradition context" "counsel[s] even further against judicial interference").  This principle is
sometimes called the Rule of Non-Inquiry.  For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d
Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial
for an alleged terrorist attack.  While the district court upheld the extradition only after receiving
testimony and extensive documentation concerning Israel's law enforcement system and
treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The
interests of international comity are ill-served," the Second Circuit explained, "by requiring a
foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its
laws and the manner in which they are enforced."  Id. at 1067.  "It is the function of the Secretary
of State to determine whether extradition should be denied on humanitarian grounds."  Id.
Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar
extradition based on allegations that appellant "may be tortured or killed if surrendered to
Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that
properly falls within the exclusive purview of the executive branch") (internal quotation marks

omitted); <u>Peroff v. Hylton</u>, 563 F.2d 1099, 1102 (4th Cir. 1977); <u>Matter of Extradition of</u>

<u>Sandhu</u>, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); <u>Hoxha v. Levi</u>, 371 F. Supp. 2d 651, 659-61

(E.D. Pa. 2005) (holding that allegations that individual would be tortured after extradition to

Albania were solely for the Secretary of State to weigh, and not an appropriate subject for

judicial inquiry), <u>on appeal</u>, No. 05-3149 (3d Cir.). <u>See generally</u> Jacques Semmelman, <u>Federal</u>

<u>Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings</u>,

76 Cornell L. Rev. 1198 (1991).

    The force of these principles is not diminished by the fact that petitioners seek judicial

review of any kind of transfer, repatriation or removal from Guantanamo, rather than merely

trying to block an extradition. The considerations that underlie the Rule of Non-Inquiry are not

endemic to the specific context of extradition, but instead rest on the constitutional separation of

powers.[11] <u>See</u> <u>Matter of Requested Extradition of Smyth</u>, 61 F.3d 711, 714 (9th Cir. 1995)

---

[11] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing <u>In re Extradition of Howard</u>, 996 F.2d 1320, 1329 (1st Cir. 1993). However, the applicable language from <u>Howard</u> was characterized as <u>dicta</u> by the First Circuit in a subsequent decision. <u>See</u> <u>Kin-Hong</u>, 110 F.3d at 111 n.12. In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance. <u>See id.</u> at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers. It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioners may contend that the only possible way to repatriate them would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit. <u>See</u> <u>United States v. Alvarez-Machain</u>, 504 U.S. 655 (1992); <u>Ker v. Illinois</u>, 119 U.S. 436 (1886); <u>Coumou v. United States</u>, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, Civ. A. No. 93-1465, 1995 WL 2292, *11 (E.D. La. Jan. 3,

(continued...)

("Undergirding this principle is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen). Thus, petitioners cannot turn to the courts to second-guess Executive judgments about matters such as custodial conditions and/or the adequacy of legal procedures in a foreign country, as well as the credibility and adequacy of a foreign government's assurances. Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry'") (quoting Chicago & S. Air Lines, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring that petitioners' counsel and this Court be given advance notice of any upcoming transfer or release. Neither the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of ordering custody that the United States wishes to relinquish to nevertheless be artificially and indeterminately prolonged

---

[11](...continued)
1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

purely to preserve a live case for the Court. And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of repatriation for that of the appropriate Executive Branch officials.

## IV.    AN INJUNCTION REQUIRING ADVANCE NOTICE WOULD TRAMPLE ON THE SEPARATION OF POWERS

It is undisputed that the sole reason petitioners seek advance notice is to enable them to seek an order blocking a transfer or repatriation decision that the Executive would already have made after consultation and coordination with the foreign government in question. Such an advance notice requirement foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of then Deputy Assistant Secretary Waxman and then Ambassador Prosper submitted herewith. See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm. See supra Section III.B (describing interests that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Moreover, the very prospect of judicial review, as exemplified by an advance notice requirement, causes separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"). An advance notice requirement,

after all, would make the results of diplomatic dialogue between the Executive Branch and a

foreign government regarding repatriations or transfers inherently contingent because the

effective acquiescence of another Branch (i.e., the Judiciary) would be required for a transfer or

repatriation to go forward, and such a requirement would also inject delays into future transfers.

These harms weigh heavily against entry of a preliminary injunction.

## V.     AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested

with the authority both to conduct military functions, such as detention of enemy combatants for

the duration of hostilities, and to engage in foreign relations, to act without undue intrusion

within its constitutional sphere of responsibility.[12]  As one Judge of this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon
> the foreign policy and war powers of the Executive on a deficient factual record.
> Where the conduct of the Executive conforms to law, there is simply no benefit –
> and quite a bit of detriment – to the public interest from the Court nonetheless
> assuming for itself the role of a guardian ad litem for the disposition of these
> detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the
> judicial function for a court to review foreign policy decisions of the Executive
> Branch.").

--------

[12] While two Judges, in granting preliminary injunctions, have relied on the general
statement that "[i]t is always in the public interest to prevent the violation of a party's
constitutional rights," G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079
(6th Cir. 1994), cited in Al-Joudi v. Bush, Civ. A. No. 05-0301 (GK), 2005 WL 774847, at *6
(D.D.C. Apr. 4, 2005); Abdah, 2005 WL 711814, at *6, that formulation leaves the question
what violations of constitutional rights (assuming arguendo that enemy aliens detained at
Guantanamo possess rights under the United States Constitution, but see Khalid v. Bush, 355 F.
Supp. 2d 311, 320-23 (D.D.C. 2005)) are present or imminent here and stand to be prevented by
an injunction.  As discussed above, respondents' policy and practices governing transfer and
repatriation of Guantanamo detainees plainly do not violate any rights petitioners may have,
constitutional or otherwise.  The public interest surely does not support assuming without any
foundation that Executive Branch officials are wont to engage in constitutional violations unless
supervised by the courts.

<u>Al-Anazi</u>, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.


## <u>CONCLUSION</u>

For the reasons stated above, respondents respectfully request that petitioners' motion for preliminary injunction be denied.

Dated: September 6, 2006                      Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

   /s/ James J. Schwartz
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ (D.C. Bar No. 468625)
PREEYA M. NORONHA
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
EDWARD H. WHITE

Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 616-8267
Fax:  (202) 616-8470

Attorneys for Respondents